IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG <br><br> **This Document Relates to** *Singer et al v. 3M Company et al,* 2:18-cv-03336-RMG |
| DIANE SINGER; BRIAN VALENTIN and KELLY VALENTIN, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs,* <br><br>      *-against -* <br><br> THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co), TYCO FIRE PRODUCTS L.P., successor-in-interest to THE ANSUL COMPANY; NATIONAL FOAM, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; CHEMGUARD, INC.; E.I. DU PONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, L.L.C., individually and as successor in interest to DuPont Chemical Solutions Enterprise, DYNAX CORPORATION, CORTEVA, INC., DUPONT DE NEMOURS, INC f/k/a DOWDUPONT, INC. and COUNTY OF SUFFOLK, | **FIRST AMENDED COMPLAINT** |

---

*Defendants.*

---

---

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

---

Plaintiffs, DIANE SINGER; BRIAN VALENTIN and KELLY VALENTIN, by and through their undersigned counsel, hereby files this First Amended Class Action Complaint, individually, and on behalf of all others similarly situated, and makes these allegations based on information and belief and/or which are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery against Defendants, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co), TYCO FIRE PRODUCTS L.P., successor-in-interest to THE ANSUL COMPANY; NATIONAL FOAM, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; CHEMGUARD, INC., E.I. DU PONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, L.L.C., individually and as successor in interest to DuPont Chemical Solutions Enterprise, DYNAX CORPORATION, CORTEVA, INC., DUPONT DE NEMOURS, INC f/k/a DOWDUPONT, INC. and COUNTY OF SUFFOLK, (collectively "Defendants") as follows:

## INTRODUCTION

**The Contamination of Yaphank, New York**

1.     The community of Yaphank, New York is located in eastern Suffolk County, Long Island. The community receives their water from a sole source aquifer.

2

2.     The Community is nearby and downgradient of the Suffolk County Firematics Training Facility (also known as the Suffolk County Fire Academy) (hereinafter "the Training Facility") which is located in the Town of Brookhaven in Suffolk County on the eastern end of Long Island.

3.     Municipal fire training facilities and academies have used aqueous firefighting foams ("AFFF") and other materials containing perfluorooctanesulfonic acid ("PFOS") and related fluorochemicals that can degrade to perfluorooctanoic acid ("PFOA") or PFOS.

4.     These sites have been linked to the contamination of surface and groundwater with PFOA, PFOS and other perfluorinated chemicals ("PFCs") throughout the country.

5.     PFOA and PFOS that was released from the Training Facility contaminated the sole source aquifer relied upon by the residents of Yaphank.

6.     PFOA has been detected in levels exceeding the current EPA Health Advisory Limit of 70 parts per trillion (ppt) in the aquifer that provides water to Yaphank's residents through both municipal water systems and private wells.

**Health Effects of PFOS and PFOA Exposure**

7.     PFOA, also known as C8, has been studied extensively by among others, a Science Panel that was formed out of a class action settlement from a lawsuit arising from contamination from DuPont's Washington Works located in Wood County West Virginia. This panel consisted of three epidemiologists who were specifically tasked with determining whether there was a probably link between C8 and human diseases. The panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

**Manufacture and Use of Aqueous Film Forming Foam ("AFFF")**

8.    Defendants The 3M Company (f/k/a Minnesota Mining and Manufacturing, Co), Tyco Fire Products L.P., successor-in-interest to The Ansul Company; National Foam, Inc. Buckeye Fire Equipment Company; Chemguard, Inc., E.I. Du Pont De Nemours And Company, individually and as successor in interest to DuPont Chemical Solutions Enterprise, The Chemours Company, individually and as successor in interest to DuPont Chemical Solutions Enterprise, The Chemours Company FC, L.L.C., individually and as successor in interest to DuPont Chemical Solutions Enterprise, Dynax Corporation, Corteva, Inc. and Dupont De Nemours, Inc f/k/a Dowdupont, Inc.    (collectively referred to herein as the "Manufacturing Defendants") manufactured AFFF that contained fluorochemical surfactants, believed to include PFOS, PFOA, and/or certain other PFC's that degrade into PFOS or PFOA. As the manufacturers of AFFF, the Defendants knew or should have known that the inclusion of PFCs in AFFF presented an unreasonable risk to human health and the environment. Defendants also knew or should have known that PFCS are highly soluble in water, highly mobile, extremely persistent in the environment, and highly likely to contaminate water supplies if released to the environment.

9.    The Defendants marketed and sold their products with knowledge that large quantities of toxic, PFCs-containing AFFF would be used in training exercises and in emergency situations at military bases and airports, including the Training Facility, in such a manner that dangerous chemicals would foreseeably be released into the groundwater and environment.

10.    The Defendants marketed and sold their products with knowledge that large quantities of toxic, PFCs-containing AFFF would be stored in fire suppressant systems and tanks on Air Force Bases, airports, and fire training facilities that such systems and storage were used and maintained in such a manner that dangerous chemicals would be released into the groundwater and environment.

4

**Suffolk County's Ownership of the Training Facility**

11.     The Suffolk County Firematics Training Facility, also known as Suffolk County Fire Academy, is located at 676 Pine Street in the Town of Brookhaven, Suffolk County.

12.     At all times relevant herein, Defendant Suffolk County has been the owner and operator of the Training Facility and has been used as a firefighting training facility since 1959.

13.     Defendant Suffolk County commissioned the construction of the Fire Training Center in 1959, which consisted of a training tower, smokehouse, and oil pits. These structures formed the basis for the complex today.

14.     Between 1959 and 1981, the Class A residential burn building, the Railroad Tank Car, Taxpayer facility, Pump Test building, LP Gas facility, maze facility and the classroom/administration building were added.

15.     During the mid-1980s the Vocational Education and Extension Board of the County of Suffolk changed the designation from the Fire Training Center to the Suffolk County Fire Academy.

16.     Upon information and belief, AFFF, which contains both PFOA and PFOS, has been used at the Training Facility in training exercises from 1959 until May 2016.

17.     The depth of groundwater is approximately 10 feet below ground surface (bgs).

18.     The Suffolk County Department of Health Services (SCDHS) Office of Water Resources initiated a groundwater investigation in July of 2016 to investigate the potential PFOS and PFOA groundwater contamination from the historic use of AFFF at the Training Facility.

19.     SCDHS collected groundwater profile samples from 12 temporary monitoring wells on-site and downgradient of the site. PFOS/PFOA detections were reported in all twelve temporary monitoring wells, with seven wells exceeding the USEPA health advisory (HA) of 70

parts per trillion (70 ppt) for PFOS and PFOA, combined. Five wells had PFOS/PFOA detections, below the HA.

20.     On-site detections exceeding the HAL ranged from 170 ppt to 418 ppt of PFOS/PFOA, combined. Off-site detections exceeding the HAL ranged from 93 ppt to 986 ppt of PFOS/PFOA, combined.

21.     PFOS/PFOA has also been detected in twenty-five downgradient private wells. Ten private wells exceed the HA. The SCDHS is evaluating locations for additional monitoring wells. A full remedial investigation is recommended at the subject site and surrounding area in order to determine the full extent and magnitude of the PFOS/PFOA contamination in the groundwater.

22.     In May of 2017, New York State Department of Environmental Conservation (NYSDEC) declared the Suffolk County Firematics Training Facility a Class 2 Superfund Site that presents a significant threat to public health and/or the environment.

23.     The NYSDEC has recommended a full remedial investigation at the Training Site and surrounding area in Yaphank in order to determine the full extent and magnitude of the PFOS/PFOA contamination.

**Plaintiffs' Exposure and Damages**

24.     Plaintiffs have suffered personal injury, bioaccumulation of PFOA and property damage as a result of the PFOA and PFOS contamination of their water supplies by AFFF that has entered the community of Yaphank.

25.     The Plaintiffs and the class, as residents in the community of Yaphank, have been exposed for many years to PFCs including at concentrations hazardous to their health.

26.     The properties of the Plaintiffs and the class have been damaged as a result of the presence of PFC's present in the groundwater and drinking water in both private and municipal wells.

27.     Plaintiffs seek recovery from Defendants for injuries, damages and losses suffered by the Plaintiffs, each of whom suffered injuries as a result of exposure to the introduction of PFOA, PFOS and other toxic substances into the drinking water of Yaphank, in an amount to be determined at trial, exclusive of interest, costs, and attorneys' fees.

## JURISDICTION AND VENUE

28.     Upon information and belief, this Court has personal jurisdiction over the Manufacturing Defendants as each of them is doing business in New York by manufacturing, distributing, producing and marketing products, services and/or materials in this State and/or to this State.

29.     At all relevant times to the Complaint, Defendants conducted business in New York and availed themselves to the legal rights in New York thereby.

30.     Upon information and belief, Defendants maintain websites accessible to New York residents.

31.     Defendants have systematic and continuous commercial contacts with New York to establish jurisdiction over them pursuant to CPLR 302.

32.     This Court has personal jurisdiction over the defendants as each of them are doing business in New York and engage in business in New York such that it is reasonably foreseeable that they would be subject to jurisdiction of the courts of this State.

33.     This case is properly venued in this Court pursuant to CPLR 503(a), due to the residence of Plaintiffs because they reside in Suffolk County.

34.    This case is properly venued in this Court because Defendant Suffolk County owned and/or operated the Training Facility at the time of the disposal and/or release of hazardous and toxic substances.

35.    This case is properly venued in this Court because the actions of the Defendants and the injuries and damages alleged herein all occurred in the County of Suffolk, New York.

## PARTIES

**PLAINTIFF(S)**

36.    Plaintiff Diane Singer is a resident of Yaphank, New York, who currently resides at 48 Schiller Court, Yaphank, New York, 11980.

37.    Diane Singer owns the property at 48 Schiller Court, and has lived there since 1994. She receives her water from a municipal well.

38.    Plaintiff Diane Singer has been exposed to elevated levels of PFCs, and is at an increased risk of several health effects, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, kidney cancer, and other autoimmune diseases.

39.    Plaintiff Diane Singer has a fear of developing debilitating injuries as a result of her exposure to PFCs, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, kidney cancer, and other autoimmune diseases.

40.    PFCs have entered 48 Schiller Court, including but not limited to the accumulation of PFCs in the pipes, faucet, showerheads, and appliances.

41.    On July 12, Diane Singer filed a Notice of Claim against Defendant County of Suffolk pursuant to General Municipal Law (GML) Section 50-e for the injuries alleged herein.

42.    On October 5, 2017, Defendant County of Suffolk conducted a hearing pursuant to GML Section 50-h of Plaintiff Diane Singer.

43.     At least thirty (30) days have elapsed since the Notice of Claim was filed and Defendant County of Suffolk has refused to adjust or to satisfy Diane Singer's claim.

44.     Plaintiffs Brian Valentin and Kelly Valentin are residents of Yaphank, New York, who currently reside at 247 Yaphank Avenue, Yaphank, New York, 11980.

45.     Plaintiffs Brian Valentin and Kelly Valentin own the property at 247 Yaphank Avenue, and has lived there since 2002. They receive their water from a municipal well.

46.     Plaintiffs Brian Valentin and Kelly Valentin have been exposed to elevated levels of PFCs, and are at an increased risk of several health effects, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, kidney cancer, and other autoimmune diseases.

47.     Plaintiffs Brian Valentin and Kelly Valentin have a fear of developing debilitating injuries as a result of their exposure to PFCs, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, kidney cancer, and other autoimmune diseases.

48.     PFCs have entered 247 Yaphank Avenue, including but not limited to the accumulation of PFCs in the pipes, faucet, showerheads, and appliances.

49.     On July 12, Plaintiffs Brian Valentin and Kelly Valentin filed a Notice of Claim against Defendant County of Suffolk pursuant to General Municipal Law (GML) Section 50-e for the injuries alleged herein.

50.     On September 21, 2017, Defendant County of Suffolk conducted a hearing pursuant to GML Section 50-h of Plaintiffs Brian Valentin and Kelly Valentin.

51.     At least thirty (30) days have elapsed since the Notice of Claim was filed and Defendant County of Suffolk has refused to adjust or to satisfy Brian Valentin or Kelly Valentin's claims.

**DEFENDANTS**

52.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

53.     The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

54.     Upon information and belief, each of the Defendants are responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

55.     Defendant 3M Company ("3M") is, upon information and belief, a Delaware corporation and does business throughout the United States, including conducting business in New York, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

56.     At all times relevant herein, 3M designed, manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the country, including the Training Facility.

57.     Defendant 3M is an American multinational corporation based in Minnesota. 3M was founded in 1902 as the Minnesota Mining and Manufacturing Company.

58.     With approximately $30 billion in annual net sales, 3M employs approximately 90,000 people, operates in approximately 70 countries, people and produces more than 55,000 products.

59.     Beginning before 1970 and until at least 2002, 3M manufactured, distributed and sold AFFF-containing PFCs that included but was not limited to PFOS.

60.     3M was the only company that manufactured or sold AFFF-containing PFOS.

61.     Defendant 3M is subject to the jurisdiction of this Court pursuant to CPLR § 302.3M is engaged in substantial and not isolated activity in this state; all as more fully alleged herein.

62.     Defendant TYCO PRODUCTS L.P., successor-in-interest to THE ANSUL COMPANY (hereinafter "Tyco") is a Delaware corporation having a principal place of business at 1400 Pennbrook Parkway, Landsdale, Pennsylvania 19446. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International plc, an Irish public limited company listed on the New York Stock Exchange [NYSE: JCI].

63.     Tyco manufactures the Ansul brand of products and AFFF, and upon information and belief, is the successor-in-interest of the corporation formerly known as the Ansul Company (hereinafter "Ansul"). [hereinafter, "Ansul and/or Tyco as the successor in interest to Ansul" will be referred to collectively as "Tyco/Ansul."]. At all times relevant, Tyco/Ansul designed,

11

manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the country, including the Training Facility.

64.     Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained fluorocarbon surfactants containing PFOA. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFFF that contained PFOA.

65.     National Foam, Inc. (a/k/a Chubb National Foam) (National Foam, Inc. and Chubb National Foam are collectively referred to as "National Foam") is a Delaware corporation, having a principal place of business at 144 Junny Road, Angier, North Carolina 27501. At all times relevant, National Foam designed, manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the country, including the Training Facility.

66.     Defendant Buckeye Fire Equipment Company is a North Carolina corporation with its principal place of business at 110 Kings Road, Kings Mountain, NC 28086. At all times relevant to the present litigation Buckeye Fire Equipment Company designed, manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the country, including the Training Facility.

67.     Defendant Chemguard is a Texas corporation having its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

68.     Beginning in or around 1994, Chemguard began manufacturing AFFF that contained PFOA.

69.     At all times relevant to the present litigation Chemguard designed, manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the country, including the Training Facility.

70.     DuPont Chemical Solutions Enterprise ("DuPont Chemical") was a Delaware Corporation, with a principal place of business located at 1007 Market Street Wilmington, Delaware 19898.

71.     DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

72.     In a letter addressed to the Office of Pollution Prevention and Toxics (OPPT) Document Control Office, dated May 14, 2003 and signed by Stephen H. Korzeniowski, DuPont Chemical Solutions Enterprise provided its Telomer-based sales products in the United States for the year 2002.

73.     The letter, which was redacted and sent to the USEPA under its PFOA Stewardship Program, included Aqueous Fire Fighting Foam (AFFF) sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.[1]

74.     Upon information and belief, at all times relevant to the present litigation, DuPont Chemical designed, manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the country, including the Training Facility.

75.     Defendant, E.I. Du Pont de Nemours & Co. ("DuPont"), successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware Corporation and does business throughout the United States, including conducting business in New York. Its principal place of business is 974 Centre Road Wilmington, Delaware 19805.

---

[1] https://www.regulations.gov/docket?D=EPA-HQ-OPPT-2006-0621.

76.     Upon information and belief, at all times relevant to the present litigation, DuPont designed, manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the country, including the Training Facility.

77.     Defendant Chemours Company ("Chemours"), successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware Corporation and conducts business throughout the United States, including conduction business in New York. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19889.

78.     Upon information and belief, at all times relevant to the present litigation, Chemours designed, manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the country, including the Training Facility.

79.     Defendant The Chemours Company FC L.L.C. ("Chemours Company"), successor in interest to DuPont Chemical Enterprise, is a Delaware Corporation and conducts business throughout the United States, including conduction business in New York. Its principal place of business is 1007 Market Street Wilmington, Delaware, 19899.

80.     Upon information and belief, at all times relevant to the present litigation, Chemours Company designed, manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the country, including the Training Facility.

81.     Defendant Dynax Corporation is a Delaware Corporation that conducts business throughout the United States, including business in New York.  Its principal place of business is 103 Fairview Park Drive Elmsford, New York, 10523-1544.

82.     In 1991, Dynax Corporation entered the AFFF business, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

83.     At all times relevant, Dynax Corporation designed, manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the country, including the Training Facility.

84.     Defendant Corteva, Inc. is a Delaware Corporation and conducts business throughout the United States, including conduction business in New York. Its principal place of business is 974 Centre Rd, Wilmington, Delaware 19805.

85.     At all times relevant to the present litigation, Corteva, Inc. designed, manufactured and sold AFFF used in training operations and to fight fires at numerous military bases and other locations throughout the country, including the Training Facility.

86.     Defendant Dupont de Nemours formerly known as DowDuPont, Inc. is a Delaware Corporation and conducts business throughout the United States, including conduction business in New York. Its principal place of business is 1999 Bryan Street, Suite 900 Dallas, TX 75201.

87.     At all times relevant to the present litigation, Dupont de Nemours formerly known as DowDuPont, Inc. designed, manufactured and sold AFFF used in training operations and to fight fires at numerous military bases and other locations throughout the country, including the Training Facility.

88.     Defendant Suffolk County is a municipal corporation organized to the laws of the State of New York, and is a political subdivision of the State.

89.     On July 12, 2017, Plaintiffs filed a Notice of Claim against Defendant Suffolk County pursuant to New York Gen. Mun. Law. §50-e.

90. Plaintiffs have complied with all procedural requirements under New York Gen. Mun. Law §§50-e, h before bringing the instant actions.

91. At all times relevant to the present litigation, Defendant Suffolk County was the owner and operator of the Training Facility where AFFF firefighting foam was used and subsequently discharged into the groundwater and surrounding environments, injuring Plaintiffs and the putative subclasses.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

**PFOA Background**

92. Perfluorooctanoic acid (PFOA, also known as C8 or perfluorooctanoate) is a man-made, manufactured chemical not found in nature that belongs to a group of fluorine-containing chemicals called perfluorinated chemicals (PFC's). These chemicals were and are used to make household and commercial products that resist heat and chemical reactions, and repel oil, stains, grease, and water as well as other uses.

93. In 1947, 3M began producing PFOA via electrochemical fluorination.

94. Over the years, a number of companies, including but not limited to, Arkema, Asahi, BASF, Clariant, Daikin, DuPont, and Solvay Selexis have manufactured PFOA within the United States.

95. PFOA is a fluorine-containing chemical that is primarily used in the production of fluoropolymers such as poly-tetra-fluoro-ethylene ("PTFE").

96. PFOA is readily absorbed after consumption or inhalation, and it accumulates primarily in the blood stream, kidney and liver.

97. In 2006, eight major PFOA manufacturers agreed to participate in the U.S. Environmental Protection Agency's ("EPA") PFOA Stewardship Program. The participating

companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95%, no later than 2010.

98.     According to Defendant County of Suffolk's website, use of PFOS and PFOA were not considered to be hazardous before April 25, 2016, when the New York State Department of Environmental Conservation added the two chemicals to the state's list of hazardous substances.[2]

99.     In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)[3]," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA's, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.

100.     As of May 2016, the EPA issued Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS[4]. The EPA identifies the concentration of PFOA or PFOS in drinking water at or below which health effects are not anticipated to occur over a lifetime of exposure at 70 parts per trillion (ppt). While health advisories are non-regulatory, they reflect the EPA's assessment of the best available peer-reviewed science.

101.     PFOA gets into the environment from industrial facilities that make PFOA or use PFOA to make other products. It also enters the environment when released from PFOA-containing consumer and commercial products during their use and disposal.

---

[2] http://www.suffolkcountyny.gov/Departments/HealthServices/GroundWaterQualityYaphank.aspx.

[3] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

[4] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 101 (May 25, 2016)

102.    PFOA can remain in the environment, particularly in water, for many years and can move through soil and into groundwater, or be carried in air.

103.    Human studies show associations between increased PFOA levels in blood and an increased risk of several health effects, including high cholesterol levels, high blood pressure, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.

104.    These injuries can arise months or years after exposure to PFOA.

105.    PFOA's extreme persistence in the environment and its toxicity, mobility and bioaccumulation potential, pose potential adverse effects to human health and the environment.

**AFFF Background**

106.    Aqueous film forming foam (AFFF) is Class-B firefighting foam. It is water based and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

107.    AFFF was introduced commercially in the mid-1960s and rapidly became the primary fire fighting foam in the U.S. and many parts of the world. AFFF provided superior performance over normal Protein foam, which had been in wide spread use since World War II.

108.    AFFF's are synthetically formed by combining fluorine free hydrocarbon foaming agents with highly fluorinated surfactants. When mixed with water, the resulting solution has the characteristics needed to produce an aqueous film that spreads across the surface of a hydrocarbon fuel. It is this film formation feature that provides fire extinguishment and is the source of the designation, aqueous film forming foam.

109.    The Air Force began using PFC-based AFFF in 1970 to extinguish fuel-based fires.

18

110.     Beginning in 2009, the USAF followed the EPA issued short-term provisional health advisory of 400 ppt for PFA and 200 ppt of PFOS. The USAF now applies the current EPA lifetime exposure health advisory of 70 ppt for both PFOA and PFOS.[5]

111.     Fluorosurfactants used in 3M's AFFF were produced by a unique process known as electrochemical fluorination (ECF). The ECF process results in a product that contains and/or breaks down into compounds containing PFOA and/or PFOS.

112.     In the foam industry, concentrates are typically referred to as "3%" or "6%" concentrate, depending on the mixture rate with water. AFFF concentrates contain about 60-90% water and have a fluorine content of about 0.3-1.8%.

113.     AFFF procured in the U.S. was specified to conform to either a foam standard of Underwriters Laboratory (UL) or a more stringent military specification ("MilSpec"). MilSpec AFFF's contain more fluorosurfactant and more fluorine than UL agents.

114.     AFFF's are used by the U.S. military, oil refineries and other, petrochemical industries, civil aviation and fire departments throughout the country.

**AFFF Usage in the Yaphank Area**

115.     Upon information and belief, The 3M Company (f/k/a Minnesota Mining and Manufacturing, Co), Tyco Fire Products L.P., successor-in-interest to The Ansul Company; National Foam, Inc. Buckeye Fire Equipment Company; Chemguard, Inc., E.I. Du Pont De Nemours And Company, individually and as successor in interest to DuPont Chemical Solutions Enterprise, The Chemours Company, individually and as successor in interest to DuPont Chemical Solutions Enterprise, The Chemours Company FC, L.L.C., individually and as successor in interest to DuPont Chemical Solutions Enterprise and Dynax Corporation, Corteva, Inc. and Dupont De

---

[5] *Air Force applies new EPA guidance*, Air Force Civil Engineer Center Public Affairs, May 19, 2016.

Nemours, Inc f/k/a Dowdupont, Inc. manufactured AFFF containing PFCs, among other reasons, for sale to the Department of Defense.

116.    Defendants sold AFFF that was used at the Training Facility owned by Defendant Suffolk County.

117.    It is estimated that 75% of the military AFFF inventory is an ECF-based product. This is not surprising since for most of the past 30 years 3M was the primary supplier of AFFF to the DOD [Department of Defense] stock system.[6]

118.    The military Qualified Products Database listed 3M AFFF products as early as 1970, National Foam products by 1973, and Tyco/Ansul products as early as 1976.[7]

119.    According to a 2011 Department of Defense risk alert document, "through 2001, the DoD purchased AFFF from 3M and/or Ansul, Inc. 3M supplied PFOS-based AFFF under the product name, 3M Light Water AFFF."[8]

120.    At any given time during its operation, the Training Facility housed and used thousands of gallons of AFFF concentrate manufactured by Defendants.

121.    The AFFF was expected to reach the Training Facility without substantial change in the condition in which it was sold to the Defendant Suffolk County, and it did.

122.    Defendant Suffolk County and other civilian agencies conducted training exercises at the Training Facility including firefighting and explosion training that used of AFFF manufactured by Defendants for decades.

---

[6] Fire Fighting Foam Coalition, "Estimated Quantities Of Aqueous Film Forming Foam in the United States", August, 2004.

[7] http://dcppe.org/Systems/AFFF/MIL-F-24385%20QPL%20History%20for%20Type%206%20AFFF.pdf

[8] DoD Risk Alert #03-11, "Aqueous Film Forming Foam", http://www.denix.osd.mil/cmrmp/ecmr/ecprogrambasics/resources/chemical-material-emerging-risk-alert-for-afff/

123.    Throughout the time AFFF containing PFOA and PFOS was used at the Training Facility, Defendant Suffolk County was the owner and operator of the Training Facility where the exercises were taking place.

124.    Upon information and belief, the instructions, warning labels, and material safety data sheets that were provided with the AFFF by the Defendants, which, at least at significant times, did not fully describe the health and environmental hazards of AFFF which Defendants knew or should have known existed.

125.    Upon information and belief, Defendants had known of these health and environmental hazards for years. For example, by the mid-1980s, 3M began a major program to review personnel handling of fluorochemicals and determined that fluorochemicals could bioaccumulate.

126.    In 1993, a published peer-reviewed study of 3M workers exposed to C-8 (PFOA) at a 3M manufacturing facility in Minnesota reported that "ten years of employment in exposed jobs was associated with a 3.3 fold increase … in prostate cancer mortality compared to no employment in [C-8] production. … If prostate cancer mortality is related to [C-8, C-8] may increase prostate cancer mortality by altering reproductive hormones in male workers," thus making clear to Defendants by at least 1993 that C-8 was linked to increased cancer rates in C-8-exposed humans.

127.    3M, who was the predominant manufacturer of AFFF, ceased production of PFOS-based AFFF in 2002. Under pressure from the EPA, on May 16, 2000, 3M announced it would

21

phase out production of two synthetic chemicals, PFOS and PFOA, that it had developed more than fifty years earlier.[9]

128.    An EPA internal memo on the day of 3M's phase out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term…[PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree."[10]

129.    In contrast, 3M's news release insisted that "our products are safe" while extolling their "principles of responsible environmental management" as driving the cessation of production.[11]

130.    Until recently, Defendant County of Suffolk offered a program entitled Course Number FA031 at the Training Facility which "was designed to familiarize firefighters with the practicality of and methods employed when utilizing various firefighting foams." Specifically, "Aqueous Film Forming Foam (AFFF), Polar Solvents Foams, Protein and Class A foams are all covered by this program.  The types of foam application equipment are also presented." The course was three hours long and did not have a perquisite for attendance.[12]

**Fear of Cancer**

---

[9] 3M press release, "3M Phasing Out Some Of Its Specialty Materials", May 16, 2000, http://www.chemicalindustryarchives.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1

[10] EPA internal memo, "Phaseout of PFOS", May 16, 2000, http://www.chemicalindustryarchives.org/dirtysecrets/scotchgard/pdfs/226-0629.pdf#page=2

[11] 3M press release, "3M Phasing Out Some Of Its Specialty Materials", May 16, 2000, http://www.chemicalindustryarchives.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1

[12] http://www.scfa-li.org/index.php/class-list-menu/81-hazmat/110-hazmatfoam

131.    Each and every Plaintiff has a justifiable and actual fear of developing cancer as a result of said exposure. With reasonable probability, the prospective, feared, and anticipated consequences may be expected to flow from the past harm.

132.    The degree of probability that Plaintiffs will develop cancers is such that there is a reasonable certainty that such cancers will develop at some future date, thus entitling Plaintiffs to recover from Defendants for apprehended consequences that are not presently manifested.

133.    A rational basis exists between Plaintiffs' exposure to the above-described toxins and contaminants, and Plaintiffs' currently manifested fear of developing cancer in the future.

134.    To the extent that Defendants' actions resulted in the discharge and/or release of toxic contaminants into the soil and groundwater, thereby entering and injuring Plaintiffs' physical and mental well-being, their real and personal property, and their economic interests, Defendants are jointly and severally liable for all damages from contamination in this case, their physical and mental well-being, their real and personal property, and their economic interests.

## CLASS ACTION ALLEGATIONS

135.    Plaintiffs incorporate the forgoing paragraphs as though the same were set forth at length herein.

136.    Plaintiffs and the Class bring this action and seek to certify and maintain it as a class action pursuant to Article 9 of the New York Civil Practice Law and Rules, Section 901, on behalf of themselves and similarly situated current and former residents in Yaphank, New York, subject to amendment and additional discovery as follows

a.    **Medical Monitoring Class**: all current and former residents of Yaphank who received water from the municipal water supply or a private well (the "Medical Monitoring Class"). This Class comprises the following subclasses:

  i. **Public Water Subclass**: residents who received water provided by the municipal water supply

  ii. **Private Well Water Subclass**: Residents who received water supplied by private wells within the CDPHE investigative areas

 b. **Property Damage Class**: individuals who own real property in Yaphank serviced by the municipal water supply, and those who have private wells ("Property Damage Class"). This class can be readily ascertained by U.S. Census data, property records, and county records.

137. Plaintiffs are members of both the proposed Classes they seek to represent. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

138. Excluded from the Class are:

 a. Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representative, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

 b. the Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family;

 c. any class counsel or their immediate family members; and

 d. all governmental entities.

139. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

**Numerosity and Ascertainability**

140. This action meets the numerosity requirement given that the number of impacted current and former residents in the Yaphank Area and property owners, upon information and belief, has reached the thousands, making individual joinder of class members' respective claims

impracticable. While the exact number of class members is not yet known, a precise number can be ascertained from U.S. Federal Census records, the State of New York, and the public records of the municipal entities in the Yaphank Area, and through other appropriate discovery.

141.    The resolution of the claims of the class members in a single action will provide substantial benefits to all parties and the Court. It is expected that the class members will number in the thousands.

142.    Finally, Class members can be notified of the pendency of this action by Court-approved notice methods.

**Typicality**

143.    Plaintiffs' claims are typical of the claims of class members, and arise from the same course of conduct by Defendants. Plaintiffs' persons and real property, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred damages and losses related to the introduction of PFOA, PFOS, and other toxic substances into the municipal water supplies operated in the Yaphank area as well as private wells in the area, causing personal injury and property damages.

144.    Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members. The relief Plaintiffs seek is typical of the relief sought for absent Class Members.

**Adequacy of Representation**

145.    Plaintiffs will serve as fair and adequate class representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the class

they seek to represent. Further, Plaintiffs have retained counsel competent and well experienced in class action litigation and environmental tort litigation.

146.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither the Plaintiffs nor their counsel have interests adverse to the Class.

**Predominance of Common Issues**

147.    There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, making it appropriate to bring this action. The answers to these common questions will advance resolution of the litigation as to all Class Members. These common legal and factual issues include the following:

a)      Whether Defendants engaged in the conduct alleged herein;

b)      Whether Defendants knew or should have known that exposure to PFOA and PFOS could increase health risks;

c)      Whether Defendants knew or should have known that their manufacture of AFFF containing PFOA and PFOS was unreasonably dangerous;

d)      Whether Defendants knew or should have known that their AFFF contained persistent, stable and mobile chemicals that were likely to contaminate groundwater water supplies;

e)      Whether Defendants failed to sufficiently warn users of the potential for harm that resulted from use of their products;

f)       Whether Defendants became aware of health and environmental harm caused by PFOA and PFOS in their AFFF products and failed to warn users and Plaintiffs and the Class of same

g)       The extent to which Defendants knew about the PFOA and PFOS contamination in the water in the Yaphank area.

h)       The extent to which Defendants knew about the PFOA and PFOS contamination in the water supply systems operated by the municipal entities in the Yaphank area;

i)        The extent to which Defendants knew about the PFOA and PFOS contamination in the water supplied to private wells of residents of the Yaphank area;

j)        Whether the Defendants owed a duty to the Plaintiffs and the Class to refrain from the actions that caused the contamination of the drinking water with PFOA and PFOS;

k)       Whether Defendants made unlawful and misleading representations or material omissions with respect to the health impacts of PFOA and PFOS;

l)        For the Medical Monitoring Classes, whether the risk of any health issue or bodily injury of Plaintiffs and the Class are attributable to exposure of PFOA and PFOS in the water supply;

m)      For the Property Damage Class, whether the PFOA and contamination caused and continues to cause:

(1) a continuous invasion of the property rights of the Plaintiffs and Class such that the property values in the Yaphank Area have and/or continue to decline in value following the disclosure of the PFOA contamination,

(2) have substantially interfered with Plaintiffs' and the Class' use and enjoyment of their property

ii)      a continuous invasion of the property rights of the Plaintiffs and the Subclass; and

n)      Whether Plaintiffs and Class Members are entitled to damages and other monetary relief and other equitable relief, including but not limited to punitive damages, and if so, in what amount.

o)      Whether the members of the Classes have sustained damages and the proper measure of damages.

p)      Whether Defendants are strictly liable to Plaintiffs and the Class for their actions;

q)      Whether Defendants were unjustly enriched by their actions at the expense of Plaintiffs and the classes.

**Superiority**

148.   The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case. Further, no unusual difficulties are likely to be encountered in the management of this class action. Given the great number of current and former residents of Yaphank Area impacted by Defendants' conduct, it is impracticable for Plaintiffs and the Class to individually litigate their respective claims for Defendants' complained of conduct as to do so would risk inconsistent or contradictory judgments and increase delays and expense to both parties and the court system. Therefore, the class action mechanism presents considerably less management challenges and provides the efficiency of a single adjudication and comprehensive oversight by a single court.

**CAUSES OF ACTION**
**AS AND FOR A FIRST CAUSE OF ACTION:**
**<u>Negligence</u>**

149.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

150.   This cause of action is brought pursuant to New York law.

151.    Negligence may exist both as an omission as well as an affirmative act. A cause sounding in negligence allows for the recovery for an injury that was proximately caused by another's violation of a duty of reasonable care.[13]

152.    Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to the environment and to human health.

153.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFC's, was hazardous to human health and the environment.

154.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFC's would result in the contamination of the water supply in the Yaphank Area as a result of its proximity to the Training Facility.

155.    Knowing of the dangerous and hazardous properties of the AFFF, Defendants had the duty to warn of the hazards associated with AFFF entering and poisoning the environment and groundwater.

156.    Defendants knew or should have known that safety precautions would be required to prevent the release of PFOA and PFOS into the surrounding environment.

157.    Defendants, as manufacturers, marketers, and sellers of AFFF owed Plaintiffs and the Class a cognizable duty to exercise reasonable care to ensure that AFFF was manufactured, marketed, and sold in such a way as to ensure that the end users of AFFF were are of the potential harm PFOA and PFOS can cause to human health and the environment.

158.    Upon learning of the release of the contaminants, Defendants owed Plaintiffs and the Class a duty to warn and notify Plaintiffs and the classes of the release of the contamination

---

[13] Am Jur. 2d, Negligence § 1

before it injured Plaintiffs and the Class and their property and/or to act reasonably to minimize the damage to Plaintiffs and their property.

159.    Defendants breached their duty by allowing PFOS and PFOA to be released into the drinking water (both the municipal and private wells) of the Yaphank Area through their failure to warn and notify the end users of AFFF about the danger that PFOS and PFOA would enter into the environment and groundwater.

160.    As such, the Defendants, negligently, gross negligently, recklessly, willfully, wantonly, and/or intentionally breached their legal duties to the Plaintiffs and the class, causing the contamination of drinking water in and around the residences of Plaintiffs and the Class.

161.    Defendants further breached the duties owed to the Plaintiffs and the Class by failing to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

162.    Defendants' failure to notify the Plaintiffs and the Class in a timely manner of the contamination of the Yaphank Area's drinking water, and, consequently, the presence of PFOA and PFOS in the real properties of Plaintiffs constitutes another breach of the duties that Defendants owed the Plaintiffs and the Class.

163.    Defendants' breaches of their duties were direct and proximate causes of Plaintiffs' and the Class' damages and the imminent, substantial, and impending harm to their homes and health.

164.    Defendants' breaches of their duties caused the drinking water in both the municipal and private wells to become contaminated with unsafe and dangerous levels of PFOA and PFOS.

165.     Further, Defendants' breach of their duty to timely notify the community and act reasonably in warning of the presence of PFOA and PFOS in AFFF, Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs and the Class have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

166.     Plaintiffs and the Class suffered foreseeable injuries and damages as a proximate result of said Defendants' negligent breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiffs and the Class, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs and the Class so apparent as to entitle them to be protected against such actions or inactions.

167.     Accordingly, Plaintiffs and the Classes seek damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries to their persons and property, in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Class to their original position, including but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, including the need for medical monitoring as an element of damages, and actual, consequential, and nominal damages, flowing from the negligence which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### Private Nuisance (Private Well Owners Only)

168.     Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

169.     This cause of action is brought pursuant to the laws of New York.

170.    Plaintiffs and the Property Damage Class, as described above, are owners of real property with the right of possession.

171.    Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated both the municipal drinking water system and drinking water of private wells in Yaphank and the surrounding area.

172.    At all times relevant to the present cause of action, the Manufacturing Defendants manufactured, marketed, and sold the AFFF that was used at the Training Facility that resulted in the contamination of the water supply relied upon by Plaintiffs and Property Damage Class at all relevant times.

173.    At all times relevant to the present cause of action, Defendant Suffolk County was the owner and operator of the Training Facility where AFFF containing PFOA and PFOS was used for decades in the Yaphank area.

174.    At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that large quantities of PFOA and PFOS would and/or could be introduced into the properties of Plaintiffs and the Property Damage Class.

175.    The above-described affirmative, voluntary, and intentional acts were performed with the reckless disregard of the potential for PFOA and PFOS to be disbursed through the water and onto the land and property of Plaintiffs and the Property Damage Class.

176.    Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of PFOA, PFOS and possibly other toxic substances to be released into the drinking water of the Yaphank area.

177.   The introduction of unknown quantities of PFOA and PFOS onto the property of the Plaintiffs and Property Damage Class unreasonably interfered with the use and enjoyment of their property.

178.   The contamination of class members' drinking water has interfered with the rights of Plaintiffs and the classes to use and enjoy their property.

179.   Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs and the classes to, *inter alia*, refrain from using water to drink, cook, or bathe, which has, in turn, caused significant inconvenience and expense. Defendants' conduct has also substantially interfered with class members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each class member so chooses.

180.   Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute a continuous invasion of the property rights of Plaintiffs and the classes.

181.   The potential danger from the drinking water at their residences has caused the Plaintiffs and the Class significant inconvenience and expense.

182.   This constitutes a substantial interference with the use of the properties such that it is offensive and has caused significant inconvenience or annoyance.

183.   By reason of the foregoing, Defendants are liable to Plaintiffs and the Class for the damages that they have suffered as a result of Defendants' actions, the amount of which will be determined at trial, plus reasonable attorneys' fees and costs.

### AS AND FOR A THIRD CAUSE OF ACTION
#### Failure to Warn
(as against County of Suffolk)

184.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

185.    This cause of action is brought pursuant to New York law.

186.    Defendant County of Suffolk failed to employ reasonable care that a reasonably prudent person would have under the circumstances by allowing PFOS and PFOA to be transported, used, utilized, stored, dumped, handled and/or disposed while owning and operating the Training Facility, in a manner that led to their release into the soil and local groundwater.

187.    Defendant County of Suffolk knew or should have known that the manner in which PFOA and PFOS was transported, used, utilized, stored, dumped, handled and/or disposed of at the Training Facility would result in the contamination of the water supply in the Yaphank area as a result of its proximity to the Training Facility.

188.    Further, this contamination then led to the exposure of residents of the Yaphank area to the toxins and increased their risk of numerous diseases as more fully set forth above.

189.    Defendant County of Suffolk has negligently, gross negligently, recklessly, willfully, wantonly, and/or intentionally caused the immediate and continuing contamination of soil and groundwater in and around the Yaphank Area that threatens to further contaminate Plaintiffs and the Class.

190.    Defendant County of Suffolk had a duty to warn Plaintiffs that the aforementioned releases of toxic substances including but not limited to PFOA and PFOS had occurred and that migration of the Contaminants could foreseeably contaminate the sole-source local aquifer from which Plaintiffs and the Class rely upon for water.

191.    Defendant County of Suffolk breached their duty by failing to warn Plaintiffs and the Class that they had failed to prevent the migration of PFOA and PFOS from the Training

Facility, which led and is leading to further migration of PFOA and PFOS toward the Yaphank Area.

192.    As a result of Defendant County of Suffolk's breach of their duty to warn the Plaintiffs and the Class, Plaintiffs were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs and the Class will be forced to expend millions of dollars and significant resources to test, monitor and remediate the effects of Defendants' negligence for many years into the future.

193.    Defendant County of Suffolk's breach of its duty to warn was the actual and proximate cause of Plaintiffs' injuries and the actual, imminent, and substantial damage to Plaintiffs and the Class.

194.    Plaintiffs' injuries are the natural and probable consequence of Defendants' breach of their duty.

195.    Defendants' failure to warn was a direct and proximate cause of the environmental and health impacts from PFOA, PFOS, and potentially other toxic substances, that came from the use and storage of AFFF at the Training Facility.

196.    As a result of Defendant County of Suffolk's conduct and the resulting contamination, the value and marketability of the property of the Plaintiffs' and Property Damage Class has been and will continue to be diminished. Plaintiffs and the Class Members have suffered the need for and the cost of remediation of their properties and or mitigation systems for those properties, and the cost of alterative water.

197.    As a result of the contamination Plaintiffs and the Plaintiff Class have lost use and enjoyment of their properties and have suffered annoyance and discomfort, inconvenience and

annoyance as a consequence of the contamination of their properties by Defendant County of Suffolk.

198.    As a result of Defendant County of Suffolk's conduct and the resulting contamination, the Plaintiffs and the Medical Monitoring Classes have been injured in that their exposure to PFOS, PFOA, and potentially other toxic substances has caused them to develop illnesses associated with this exposure as more fully described and/or significantly increased their risk of developing those illnesses.

### AS AND FOR A FOURTH CAUSE OF ACTION
### Products Liability, Failure to Warn
(as against the Manufacturing Defendants)

199.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

200.    This cause of action is brought pursuant to New York law.

201.    Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to the environment and to human health.

202.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFC's, was hazardous to human health and the environment.

203.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFC's would result in the contamination of the water supply in the Yaphank Area as a result of its proximity to The Training Facility.

204.    Knowing of the dangerous and hazardous properties of the AFFF, Defendants had the duty to warn of the hazards associated with AFFF entering and poisoning the environment and groundwater.

205.    Defendants failed to provide sufficient warning to the end users of AFFF, including The Training Facility, that the use and storage of Defendants' product would cause the product to be released into the environment and cause the contamination of the environment, groundwater, and drinking water, with PFOA, PFOS, and potentially other toxic substances.

206.    Further, this contamination then led to the exposure of residents of the Yaphank area to the toxins and increased their risk of numerous diseases as more fully set forth above.

207.    Adequate instructions and warnings on the AFFF products could have reduced or avoided these foreseeable risks of harm to both the residents of the Yaphank area and their property.

208.    Had Defendants provided adequate warnings, the residents of the Yaphank area could have taken measures to avoid or lessen their exposure.

209.    Had Defendants provided adequate warnings, the users of AFFF at The Training Facility could have taken steps to reduce or prevent the release of PFOA, PFOS, and potentially other toxic substances into the environment, groundwater, and drinking water.

210.    Defendants' failure to warn was a direct and proximate cause of the environmental and health impacts from PFOA, PFOS, and potentially other toxic substances, that came from the use and storage of AFFF at The Training Facility.

211.    As such, Defendant's failure to provide adequate and sufficient warnings for the AFFF that they manufactured, marketed, and sold renders the AFFF a defective product.

212.    As a result of Defendants' conduct and the resulting contamination, the value and marketability of the property of the Plaintiffs' and Property Damage Class has been and will continue to be diminished. Plaintiffs and the Class Members have suffered the need for and the

cost of remediation of their properties and or mitigation systems for those properties, and the cost of alterative water.

213.     As a result of the contamination Plaintiffs and the Plaintiff Class have lost use and enjoyment of their properties and have suffered annoyance and discomfort, inconvenience and annoyance as a consequence of the contamination of their properties by Defendants.

214.     As a result of Defendants' conduct and the resulting contamination, the Plaintiffs and the Medical Monitoring Classes have been injured in that their exposure to PFOS, PFOA, and potentially other toxic substances has caused them to develop illnesses associated with this exposure as more fully described and/or significantly increased their risk of developing those illnesses.

215.     As a result of Defendants' manufacture, sale or distribution of a defective product, Defendants are strictly liable in damages to the Plaintiffs and the Plaintiff Classes.

216.     Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiffs and members of the Plaintiff Classes.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Products Liability, Defective Design
(as against the Manufacturing Defendants)

217.     Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

218.     This cause of action is brought pursuant to New York law.

219.     Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to the environment and to human health.

220.     Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFC's, was hazardous to human health and the environment.

221.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFC's would result in the contamination of the water supply in the Yaphank area as a result of its proximity to The Training Facility.

222.    Knowing of the dangerous and hazardous properties of the AFFF, Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF that did not contain PFC's.

223.    These alternative designs and/or formulations were already available, practical, similar in cost and technologically feasible.

224.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to persons and property that was caused by the Defendants' manufacture, marketing, and sale of AFFF that contained PFC's.

225.    Additionally, the AFFF that was manufactured, marketed, and sold by the Defendants contained PFC's that were so toxic and dangerous to human health and the environment, the toxic chemicals were so mobile and persistent, that the act of designing, formulating, manufacturing, marketing, and selling this product was unreasonably dangerous under the circumstances.

226.    Further, this contamination then led to the exposure of residents of the Yaphank area to the toxins and increased their risk of numerous diseases as more fully set forth above.

227.    The AFFF manufactured, marketed, and sold by the Defendants was a defective design as the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

228.     Defendants' defective design and formulation of AFFF was a direct and proximate cause of the environmental and health impacts from PFOA, PFOS, and potentially other toxic substances, that came from the use and storage of AFFF at The Training Facility.

229.     As a result of Defendants' defective design and formulation of AFFF, the resulting contamination, the value and marketability of the property of the Plaintiffs' and Property Damage Class has been and will continue to be diminished. Plaintiffs and the Class Members have suffered the need for and the cost of remediation of their properties and or mitigation systems for those properties, and the cost of alterative water.

230.     As a result of the contamination Plaintiffs and the Plaintiff Class have lost use and enjoyment of their properties and have suffered annoyance and discomfort, inconvenience and annoyance as a consequence of the contamination of their properties by Defendants.

231.     As a result of Defendants' defective design and formulation of AFFF, the resulting contamination, the Plaintiffs and the Medical Monitoring Classes have been injured in that their exposure to PFOS, PFOA, and potentially other toxic substances has caused them to develop illnesses associated with this exposure as more fully described and/or significantly increased their risk of developing those illnesses.

232.     As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to the Plaintiffs and the Plaintiff Classes.

233.     Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiffs and members of the Plaintiff Classes.

## AS AND FOR AN SIXTH CAUSE OF ACTION
### Unjust Enrichment
(as against the Manufacturing Defendants)

234.     Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

40

235.     This cause of action is brought pursuant to New York law.

236.     Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to the environment and to human health.

237.     Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFC's, was hazardous to human health and the environment.

238.     Even after Defendants' were made aware of the dangers to human health and the environment of AFFF that contained PFC's, the continued to manufacture their product.

239.     The Defendants' continued to profit from the manufacture and sale of PFC containing AFFF after learning of the unreasonably dangerous nature of their product.

240.     Defendants' did not promptly cease selling or recall their PFC containing AFFF after learning of the dangers to human health and the environment from PFC's.

241.     As such, the Court should not permit the Defendants' to retain the benefits in the form of profits from the sale of PFC containing AFFF and the expenditures saved by the Defendants' when they did not promptly develop or invest in non-PFC containing AFFF.

242.     These expenditures saved and profits made should be awarded as a remedy in the present action.

## AS AND FOR AN SEVENTH CAUSE OF ACTION
### Trespass
(as against County of Suffolk)

243.     Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

244.     This cause of action is brought pursuant to New York law.

245.    Defendant County of Suffolk's intentional acts and/or omissions caused toxic substances, including but not limited to PFOA and PFOS, to be spilled or disposed of and released into the ground at The Training Facility and to enter the soil, groundwater and aquifer beneath.

246.    Upon information and belief, Defendant County of Suffolk had exclusive control over the Training Facility at all relevant times.

247.    PFOA and PFOS have migrated and, upon information and belief, continue to further migrate from The Training Facility to and invade Plaintiffs' properties, soil and the groundwater from which Plaintiffs and the Class draw their water from.

248.    Defendant County of Suffolk's intentional acts and omissions caused toxic substances to enter and trespass upon the land and subsurface waters of Plaintiffs and interfere with Plaintiffs' exclusive possession and/or right of possession, resulting in an unwarrantable entry onto Plaintiffs' land and subsurface waters

249.    Upon information and belief, Defendants affirmatively, voluntarily and intentionally refused to act in a manner that would prevent the migration of the Contaminants onto Plaintiffs' properties.

250.    At the time of the above-described affirmative, voluntary and intentional acts and omissions, Defendants knew or should have known that PFOA and PFOS would pass through the soil, groundwater and aquifer and contaminate Plaintiffs' and Class Members' properties.

251.    The intentional actions by Defendant County of Suffolk resulted in the immediate and continued trespass, injury and damage to Plaintiffs and the Class, their water supply and/or properties from the introduction of PFOA and PFOS into the properties, pipes, and appliances of Plaintiffs and the Class.

252.    Defendant County of Suffolk knew or should have known that failing to properly remediate would result in a further trespass upon Plaintiffs' properties and exacerbate the harm to Plaintiffs caused by the trespass.

253.    As a direct result of the foregoing trespasses by Defendant County of Suffolk, Plaintiffs have suffered injuries including, but not limited to: property damage, the difference between the current value of their property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, investigative costs, additional testing costs, treatment costs, loss of use of water, purchase of bottled water, and purchase of filtration systems.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
### Violation of the New York Uniform Fraudulent Conveyance Act
### (E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc.)

254.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

255.    Plaintiffs seek equitable and other relief pursuant to the Uniform Fraudulent Conveyance Act (UFCA) as adopted by the State of New York, against E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc. (collectively the UFCA Defendants). C.R.S. NY CLS Dr & Cr, Art 10 §§270-281.

256.    Under the UFCA: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." NY CLS Dr & Cr §273. "Every conveyance made without fair consideration when

the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment." NY CLS Dr & Cr §273-a. "Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent." NY CLS Dr & Cr §274. "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." NY CLS Dr & Cr §275.  "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." NY CLS Dr & Cr §276.

257.    The UFCA Defendants have (a) acted with actual intent to hinder, delay and defraud parties, and/or (b) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (c) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

258.    UFCA Defendants engaged in acts in furtherance of a scheme to transfer E. I. DuPont de Nemours and Company's assets out of the reach of parties such as Plaintiffs that have been damaged as a result of the UFCA Defendants' conduct, omissions, and actions described in this Complaint.

259.    It is primarily E. I. DuPont de Nemours and Company, rather than The Chemours Company, that for decades manufactured, marketed, distributed and/or sold AFFF containing PFAS and PFAS for use in AFFF with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would contaminate the Plaintiff's drinking water supply and injure the Plaintiffs.

260.    As a result of the transfer of assets and liabilities described in this Complaint, the UFCA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFAS and PFAS for use in AFFF.

261.    At the time of the transfer of its Performance Chemicals Business to The Chemours Company, E. I. DuPont de Nemours and Company had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFAS and/or PFAS compounds for use in AFFF.

262.    The UFCA Defendants acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and E. I. DuPont de Nemours and Company believed or reasonably should have believed that The Chemours Company would incur debts beyond The Chemours Company's ability to pay as they became due.

263.    At all times relevant to this action, the claims, judgment and potential judgments against The Chemours Company potentially exceed The Chemours Company's ability to pay.

264.    Pursuant to C.R.S. NY CLS Dr & Cr, Art 10 §§270-281, Plaintiffs seek avoidance of the transfer of E. I. DuPont de Nemours and Company's liabilities for the claims brought in this

Complaint and to the UFCA Defendants liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

265.    Plaintiffs further seek all other rights and remedies that may be available to it under UFTA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiffs for the damages and injuries they have suffered as alleged in this Complaint.

## <u>DAMAGES SOUGHT BY THE CLASS</u>

266.    Plaintiffs re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

267.    Plaintiffs have been caused to be exposed to elevated and hazardous levels of toxic and hazardous substances, including but not limited to PFOA and PFOS.

268.    Plaintiffs have sustained and will continue to sustain damages to their property as a result of Defendants' actions. As a result, Plaintiffs seek monetary damages for each violation of the First through Fourth Claims for Relief. In particular, Plaintiffs seek (i) monetary damages reflecting the cost to remediate Plaintiffs' property of the contamination caused by Defendants' conduct or, in the alternative, to compensate Plaintiffs for the diminution in value of their property caused by Defendants' conduct; (ii) monetary damages to compensate Plaintiffs for the loss of the use and enjoyment of their properties caused by Defendant's conduct; (iii) monetary damages for the diminution of the value of the plaintiffs' property, and (iv) monetary damages to compensate Plaintiffs for the loss of quality of life caused by Defendants' conduct.

**Medical Monitoring[14]**

269.    Plaintiffs also seek consequential damages sufficient to fund a medical monitoring program that is reasonably tailored to the exposure risks of the contaminants emanating from The Training Facility, including but not limited to PFOA and PFOS.

270.    Defendant Suffolk County's continued negligent acts and omissions in operating and maintain the Site are the proximate cause of higher than normal, in fact excessive exposure, to PFOA and PFOS.

271.    Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to the environment and to human health.

272.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFC's, was hazardous to human health and the environment.

273.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFC's would result in the contamination of the water supply in the Yaphank area as a result of its proximity to The Training Facility.

274.    The Plaintiffs and Medical Monitoring Classes have been exposed to PFOA, PFOS, and potentially other toxic substances that resulted from the use and storage of the Manufacturing Defendants' AFFF at the Training Facility, and from Defendant Suffolk County's ownership of the Training Facility.

---

[14] Medical Monitoring is not being sought as in independent cause of action but, rather, as consequential damages in connection with the personal injury and property claims sought herein as is appropriate. *See Ivory v. Int'l Bus. Machines Corp.,* 983 N.Y.S.2d 110 (2014), *leave to appeal denied*, 11 N.E.3d 204 (2014).

275. Plaintiffs and the Medical Monitoring Classes have suffered from the accumulation of PFOA and PFOS in their bodies as a result of Defendants' acts and omissions described of herein.

276. The resulting exposure significantly increased the fear and risk of Plaintiffs and the Class from contracting serious latent diseases, including but not limited to kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), hypercholesterolemia, and autoimmune diseases such as sarcoidosis.

277. The significantly increased risks associated with exposure to PFOA, make periodic diagnostic medical examinations reasonable and necessary.

278. Plaintiffs have experienced a fear of contracting serious latent diseases, including but not limited to kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), hypercholesterolemia, and autoimmune diseases such as sarcoidosis.

279. Each and every one of these Plaintiffs will incur future expenses for medical monitoring and, as a result, seek payment of their related medical expenses as an element of the consequential damages.

280. In order to compensate Plaintiffs for damages suffered due to Defendants' acts, each and every Plaintiff requires, among other things, that Defendants collectively pay the past and future costs of obtaining necessary medical care, toxicological examinations and diagnoses, and any other medical monitoring necessary in order to ascertain and treat the nature and extent of the injuries suffered due to the contamination emanated from the plume, with Plaintiffs retaining freedom of choice relative to choosing their experts. Many of these costs would not be covered by health care insurers, and if covered, may unfairly result in increased premiums.

281.    Each and every one of these Plaintiffs' increased susceptibility to certain injuries and the irreparable threat to their future health and well-being resulting from their exposure to hazardous substances and chemicals in and around their homes and businesses in the Yaphank area can only be mitigated and/or addressed by the creation of a medical program (the "Yaphank Program") including but not limited to:

a.    Establishing a program that provides education and outreach on the existence and availability of the services established under the medical monitoring program, including but not limited to the establishment of a public Website with information about the Yaphank Program, meetings with potentially eligible populations, development and dissemination of outreach materials informing current and former Yaphank residents about the program, and the establishment of phone information services;

b.    Funding further studies of the long-term effects of exposure;

c.    Funding medical surveillance for those individuals exposed to the contaminants described of herein, including PFOA and PFOS.

d.    Funding research into possible cures for the detrimental effects of breathing, living and working near the contaminants and toxicants present in the Yaphank area as a result of the acts and omissions alleged here;

e.    Gathering and forwarding to each and every one of these Plaintiffs' treating physicians' information related to the diagnosis and treatment of injuries which result from their exposure(s) in and around Yaphank;

f.    Aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of each and every one of these Plaintiffs.

282.    Prescribed monitoring procedures exist that makes the early detection of these diseases possible.

283.        The monitoring procedures or regimes are different from normally recommended procedures that would be used in the absence of the exposure.

284.    The prescribed medical surveillance is reasonably necessary according to contemporary scientific principals for persons such as Plaintiffs who have been exposed and continue to be exposed to excessive levels of the referenced hazardous chemicals and materials.

285.    Plaintiffs will suffer irreparable harm if the requested medical monitoring program is not implemented because they are in danger of suffering catastrophic latent diseases as a result of their prolonged exposure to toxic and hazardous substance caused by Defendants' negligence.

286.     Detection of these diseases and early treatment is medically reasonable and necessary to prevent progression and further injuries.

287.    It is also medically reasonable and necessary to collect data and coordinate study efforts for persons exposed to such substances in order to effectively treat Plaintiffs.

288.    Establishment of a medical monitoring program for the Plaintiffs is essential as a consequential damage from their exposure to the contaminants because without the requested medical monitoring programs, they will be subjected to further injuries and delayed treatment.

289.    Plaintiffs request that the Court appoint a plan administrator, require the Defendants to fund the medical monitoring plan, and reserve jurisdiction to enforce the terms and conditions of the plan.

290.    Accordingly, Plaintiffs are entitled to a medical monitoring program which provides for medical testing, surveillance, monitoring, and study of the Plaintiffs for conditions

caused by exposure to the references substances, as well as payment of their attorney's fees and expenses, and any other relief this court deems just and proper.

291.    A thorough medical monitoring plan can and should be developed for the Plaintiffs and Medical Monitoring Classes that will assist in the early detection and beneficial treatment of the numerous diseases that can develop as a result of exposure to PFOA and PFOS.

292.    Plaintiffs and the Subclasses have sustained and will continue to sustain damages to their property as a result of Defendants' actions. As a result, Plaintiffs and the Subclasses seek monetary damages for each violation of the First through Seventh Claims for Relief. In particular, Plaintiffs and the Subclasses seek (i) monetary damages reflecting the cost to remediate class members' property of the contamination caused by Defendants' conduct or, in the alternative, to compensate class members for the diminution in value of their property caused by Defendants' conduct; (ii) monetary damages to compensate class members for the loss of the use and enjoyment of their properties caused by Defendant's conduct; (iii) monetary damages for the diminution of the value of the plaintiffs' property, and (iv) monetary damages to compensate class members for the loss of quality of life caused by Defendants' conduct.

293.    Plaintiffs and the Subclasses also seek consequential damages sufficient to fund a medical monitoring program that is reasonably tailored to the exposure risks of the contaminants emanating from The Training Facility, including but not limited to PFOA and PFOS.

## PUNITIVE DAMAGES

294.    Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

295.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing property damage, nuisances, and injuries upon the persons and properties of Plaintiffs and the Class, disregarding their protected rights.

296.   Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFOA-containing waste would be effectively disposed of and not discharged into the surrounding environment.

297.   Defendants have caused great harm to the property and water supplies of Plaintiffs and the Class and demonstrated an outrageous conscious disregard for their safety with implied malice, warranting the imposition of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs and the Class demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A.   an award certifying the proposed Medical Monitoring and Property Damage Classes, designating Plaintiffs as the named representatives and designating the undersigned as Class Counsel;

B.   a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs and members of the Class.

C.   an order requiring that Defendants implement a testing and monitoring protocol to test each property and its drinking water for the properties belonging to the members of the Property Damage Class and, where appropriate, to implement appropriate remedial measures.

D.   an order establishing a medical monitoring protocol for Plaintiffs and the Medical Monitoring Class.

E.   an award to Plaintiffs and the Class of general, compensatory, exemplary, consequential, nominal, and punitive damages;

F.   an order for an award of attorney fees and costs, as provided by law;

G.     an award of pre-judgment and post-judgment interest as provided by law, and

H.     an order for all such other relief the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury of all claims asserted in this Verified Complaint.

Dated: Melville, New York
       March 17, 2020

                                   Respectfully submitted,

                                   **NAPOLI SHKOLNIK PLLC**

                                   By: /s/ Paul J. Napoli

                                   Paul J. Napoli, Esq.
                                   Patrick J. Lanciotti, Esq.
                                   360 Lexington Avenue, 11th
                                   New York, New York 10017
                                   (212) 397-1000
                                   pnapoli@napolilaw.com
                                   planciotti@napolilaw.com

                                   *Attorneys for Plaintiff and the putative classes*

                                   March 17, 2020